IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WALL RECYCLING, LLC,           )
                               )
              Plaintiff,       )
                               )
         v.                    )      1:20cv371
                               )
3TEK GLOBAL, LLC,              )
                               )
              Defendant.       )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This is an action alleging breach of contract for the sale of an industrial shredder. Before the court is the motion of Defendant 3TEK Global, LLC ("3TEK") to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) or, in the alternative, to transfer to the United States District Court for the Northern District of Texas.[1] (Doc. 6.) Plaintiff Wall Recycling, LLC ("Wall") opposes the motion. (Doc. 12.) For the reasons set forth below, 3TEK's motions to dismiss and to transfer will be denied.

## I.    BACKGROUND

The allegations set out in the complaint and accompanying documents (to the extent they can be considered as to the particular motion), taken in the light most favorable to Wall as

---

[1] 3TEK's earlier motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3) (see Doc. 6) has been withdrawn (Doc. 14 at 8 n.6).

the non-moving party, show the following:

Plaintiff Wall is a recycling company operating in central and eastern North Carolina. (Doc. 2 ¶ 8.) Defendant 3TEK is a manufacturer of scrap metal processing equipment, including industrial shredders, with its principal place of business in Texas. (Id. ¶¶ 2, 9.) In April 2018 Dan Wall, the owner of Wall, met Bill Padula, 3TEK's Vice President of Sales, at the Institute of Scrap Recycling Industries, Inc. convention is Las Vegas, Nevada. (Doc. 12-1 ¶ 12.) Wall was familiar with 3TEK from prior ISRI meetings and 3TEK's advertisements in various trade publications. (Id. ¶¶ 7-10.) After the Las Vegas meeting, Dan Wall states that he received "several phone calls" from Padula and that on "several occasions" Padula requested a meeting with him "for the purpose of discussing 3TEK's shredders and a potential sale to Wall Recycling." (Id. ¶¶ 13-14.) Dan Wall further states, "At first, I declined [Padula's] requests because I typically do not take meetings with vendors. However, given my interest in potentially acquiring a 3TEK shredder, I accepted one of Mr. Padula's offers to meet me at Wall Recycling's facility in Raleigh, North Carolina."[2] (Id. ¶ 14.)

---

[2] As discussed in Part II.A infra, the parties' characterizations of who initiated contact regarding a possible sale are at odds with each other. 3TEK disputes Wall's portrayal of the key events and states that it was Wall who first approached Padula and requested quotes for 3TEK shredders. (Doc. 6-1 ¶¶ 4-5.) The court sets out the facts in the light most favorable to Wall here.

According to Dan Wall, an in-person meeting between himself and Padula occurred in North Carolina in October 2018 "during which time Mr. Padula marketed 3TEK's industrial shredders and sought to complete a sale with Wall Recycling." (Id. ¶ 15.) Communications continued between Wall and 3TEK, including a second in-person meeting in North Carolina in December 2018 during which Wall states he reached a "handshake agreement" with Padula on the material terms of a sale of a 3TEK shredder. (Id. ¶¶ 16-18.) Wall states he signed a first written offer for an industrial shredder in December 2018 before receiving a second written offer in February 2019, which he also signed while in North Carolina and returned to 3TEK. (Id. ¶¶ 17, 19-20.) The agreement was for a 3TEK NEXT 6820 shredder with additional components (the "NEXT Shredder") for a total price of $2,299,500. (Doc. 2 ¶ 10.) The complaint alleges that the NEXT Shredder was a "unique piece of equipment manufactured exclusively by 3TEK" (id. ¶ 12), and Dan Wall further states that 3TEK "is the only company that provides parts, service, and support for this shredder" (Doc. 12-1 ¶ 27).

The nature of the February 2019 agreement is at the heart of this lawsuit. The form, which is signed by both parties, is titled "RE: NEXT 6280 with Mobile Downstream Quotation" ("Quotation"). (Doc. 12-1 at 11-21.) Wall alleges that the Quotation is a binding contract for the sale of a Next Shredder. In exchange for a $100,000 deposit, Wall states the Quotation conferred on Wall a

3

right of first refusal for upcoming deliveries of the NEXT Shredder.[3] (Doc. 2 ¶ 20.) If 3TEK obtained a deposit and sales contract from another customer, Wall had 72 hours to exercise its right to keep its delivery slot. (Id. ¶ 21.) If Wall exercised this right, the Quotation stated that 3TEK would then require execution of a separate sales contract and payment of an additional deposit by Wall to total 20 percent of the purchase price. (Id. ¶¶ 22.) It is undisputed that in April 2019, 3TEK informed Wall that its right of first refusal had been triggered; Wall exercised its right and paid the remainder of its deposit, an additional $359,900; but Wall did not sign the separate sales contract by 3TEK.[4] (Id. ¶¶ 24-28; Doc. 6-1 ¶¶ 9-11.) Wall alleges that it was not required to execute 3TEK's separate sales contract and, even if it was, 3TEK waived this requirement by its conduct in accepting Wall's deposit, pledging a delivery date, and updating Wall on the status of the shredder. (Doc. 2 ¶¶ 27-29.) In reply, 3TEK says that the signed Quotation was merely a right of first refusal and that the Quotation expressly required Wall to sign a separate sales contract by the end of 2019 to hold purchase of the shredder. (Doc. 6-1 ¶ 8.)

---

[3] It appears that 3TEK manufactured each NEXT Shredder one at a time, procuring commitments from individual buyers several months in advance before starting a new manufacturing cycle. (Doc. 2 ¶ 18.)

[4] Wall sent back proposed modifications to 3TEK's sales contract, but the parties never signed either version. (Doc. 2 ¶ 28; Doc. 6-1 ¶¶ 11-12.)

4

Wall alleges that 3TEK set, and then failed to abide by, three separate delivery deadlines for the shredder -- the end of September 2019, December 31, 2019, and January 24, 2020. (Doc. 2 ¶¶ 30, 35, 37.) Wall further alleges that as a result of missing the December 2019 deadline, 3TEK modified its contract to give Wall a 10 percent discount on the shredder and a $15,000 credit for use on replacement parts, and to assemble the shredder for free in North Carolina. (Id. ¶ 36.) Wall alleges that in February 2020, 3TEK informed Wall that a NEXT Shredder was complete but 3TEK would not deliver it because the parties did not have a contract, rejected Wall's offer to purchase, and refunded Wall's deposit. (Id. ¶¶ 39-40.) This amounts, in Wall's view, to a material breach of the contract.[5] (Id. ¶ 41.)

Wall filed a complaint in the General Court of Justice, Superior Court Division in Durham County, North Carolina, on March 23, 2020. (Doc. 2.) 3TEK timely removed the case to this court and moved to dismiss. (Doc. 6.) Wall filed a response in opposition (Doc. 12), and 3TEK filed a reply (Doc. 14). The issues are fully briefed and ready for decision.

---

[5] Once again, and as discussed in Part II.B infra, 3TEK's characterizations of these events is different. 3TEK states that it gave Wall's delivery slots to other customers because Wall never signed the separate sales contract, that Wall cancelled the Quotation in October 2019, and that 3TEK sent Wall a new quote with certain concessions in February 2020 but the parties again never finalized a sales contract, at which point 3TEK refunded Wall's original deposit. (Doc. 6-1 ¶¶ 12-21.)

## II.  ANALYSIS

### A.  Motion to Dismiss Pursuant to Rule 12(b)(2)

3TEK first moves to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  (Doc. 6 ¶ 2.)  When properly raised, personal jurisdiction is a threshold question that precedes consideration of the merits of a claim.  See Sucampo Pharm., Inc. v. Astellas Pharma, Inc., 471 F.3d 544, 548 (4th Cir. 2006)("[T]he dismissal of a case on an issue relating to the merits of the dispute, such as failure to state a claim, is improper without resolving threshold issues of jurisdiction, including personal jurisdiction.").  Accordingly, the court will address this ground for dismissal first.

"[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016) (citing Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)).  The court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676.  Where both parties present evidence regarding personal jurisdiction, "factual

6

conflicts must be resolved in favor of the party asserting jurisdiction for the limited purpose of determining whether a *prima facie* showing has been made." <u>Vision Motor Cars, Inc. v. Valor Motor Co.</u>, 981 F. Supp. 2d 464, 468 (M.D.N.C. 2013) (citing <u>Mylan Labs., Inc. v. Akzo, N.V.</u>, 2 F.3d 56, 62 (4th Cir. 1993).

Analysis of personal jurisdiction consists of a two-part inquiry: first, whether the exercise of jurisdiction is authorized under the state's long-arm statute; and second, whether the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment. <u>Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp.</u>, 825 F. Supp. 2d 664, 677 (M.D.N.C. 2011). Under North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4, North Carolina courts are permitted to exercise "personal jurisdiction over a defendant to the outer limits allowable under federal due process." <u>Universal Leather, LLC v. Koro AR, S.A.</u>, 773 F.3d 553, 558 (4th Cir. 2014). Thus, the two-part inquiry merges into a single question: whether the exercise of jurisdiction comports with due process. <u>Id.</u> at 559.

Under the Due Process Clause, a court can have personal jurisdiction over a defendant in either of two ways: either general personal jurisdiction over a defendant who has "'continuous and systematic' contacts with the forum state regardless of where the relevant conduct occurs," or specific personal jurisdiction, which "requires only that the relevant conduct have such a connection

7

with the forum state that it is fair for the defendant to defend itself in that state." Pan-Am., 825 F. Supp. 2d at 677 (quoting CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 292 n.15 (4th Cir. 2009).

Construing the complaint and affidavits in the light most favorable to Wall, the court finds no contention or evidence that general jurisdiction exists. The inquiry will therefore proceed solely as to the question of specific jurisdiction. See Auto-Owners Ins. Co. v. LBC Landscaping Servs., Inc., No. 1:19CV1011, 2020 WL 3893284, at *3 (M.D.N.C. July 10, 2020).

Specific personal jurisdiction exists when the cause of action arises out of the defendant's contacts with the forum state. Pan-Am., 825 F. Supp. 2d at 677. Specific jurisdiction requires the court to determine: "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. at 680 (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)). Each prong must be satisfied. Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278-79 (4th Cir. 2009).

The first prong directs the court to consider "the extent to which the defendant purposefully availed itself of the privilege

8

of conducting activities in the State." Id. at 278. The
purposeful availment inquiry is "grounded on the traditional due
process concept of 'minimum contacts'" in which the court asks
whether the defendant's conduct and connection with the forum state
makes it reasonably foreseeable that he could be "haled into court
there." Universal Leather, 773 F.3d at 559. The analysis is
"flexible," id. at 560, and requires a defendant to have a
"substantial connection" to the forum state rather that contacts
that are merely "random, fortuitous, or attenuated." Burger King
Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). The Fourth Circuit
has articulated a non-exhaustive list of factors to consider in
determining whether a business has purposefully availed itself of
the privilege of conducting business in a forum state:

> (1) whether the defendant maintains offices or agents in
> the forum state; (2) whether the defendant owns property
> in the forum state; (3) whether the defendant reached
> into the forum state to solicit or initiate business;
> (4) whether the defendant deliberately engaged in
> significant or long-term business activities in the
> forum state; (5) whether the parties contractually
> agreed that the law of the forum state would govern
> disputes; (6) whether the defendant made in-person
> contact with the resident of the forum in the forum state
> regarding the business relationship; (7) the nature,
> quality and extent of the parties' communications about
> the business being transacted; and (8) whether the
> performance of contractual duties was to occur within
> the forum.

Consulting Eng'rs Corp., 561 F.3d at 278 (internal citations
omitted).

After careful consideration of all the relevant factors, the

9

court finds that Wall has made out a *prima facie* case for the existence of specific personal jurisdiction at this time.

As to the first two factors, it is uncontested that 3TEK does not have an office or agents or own property in North Carolina. (Doc. 7 at 14; Doc. 12 at 8.)

The third factor asks whether 3TEK "reached into" North Carolina to solicit or initiate business. See Consulting Eng'rs Corp., 561 F.3d at 278. Under Fourth Circuit precedent, "special weight" is given to this factor. CFA Inst., 551 F.3d at 295 n.17. Courts will often find a defendant's contacts insufficient for personal jurisdiction if the plaintiff initiated contact with the defendant. See, e.g., Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 451 (4th Cir. 2000); Worldwide Ins. Network, Inc. v. Trustway Ins. Agencies, LLC, No. 1:04CV00906, 2006 WL 288422, at *5 (M.D.N.C. Feb. 6, 2006); Sea-Roy Corp. v. Parts R Parts, Inc., No. 1:94CV00059, 1996 WL 557857, at *6 (M.D.N.C. July 30, 1996) ("[P]ersonal jurisdiction cannot be exercised over a foreign supplier who has no contact with the forum other than being solicited to contract by an individual in the forum."); cf. Burlington Indus., Inc. v. Yanoor Corp., 178 F. Supp. 2d 562 (M.D.N.C. 2001) (personal jurisdiction exists when out-of-state defendant initiated contact with North Carolina plaintiff and parts of the contract were negotiated over two in-person meetings in North Carolina, even though the defendant had no office

10

or agent in North Carolina). The rationale for giving this factor such importance appears to be to ensure the nonresident defendant's contacts with the forum state arose out of its deliberate actions, and not merely because the plaintiff happened to be located there. See Worldwide Ins., 2006 WL 288422, at *5 ("[T]he evidence suggests that the contacts that exist between Defendants and North Carolina arose because [Plaintiff] was located in North Carolina and not because Defendants purposely directed their activities at the state of North Carolina.").

Given the importance the Fourth Circuit has placed on this factor, it is understandable that the parties devote significant attention to it in their briefs. (See Doc. 7 at 15-18; Doc. 12 at 8-9; Doc. 14 at 1-3.) Each party's version of who initiated contact is at odds with the other. 3TEK states that it was Wall CEO Dan Wall who "initiated contact with 3TEK in Nevada to establish a business relationship with 3TEK in Texas, and 3TEK's contacts with North Carolina all relate to Wall's solicitation." (Doc. 7 at 15.) Wall, while acknowledging that Dan Wall and Bill Padula first met in Las Vegas, alleges that 3TEK was the main pursuer: "3TEK pursued Wall Recycling as a potential customer in North Carolina. Padula called Wall to promote 3TEK's products and repeatedly requested meetings with Wall in North Carolina. Wall agreed to a meeting in Raleigh in October 2018, during which Padula solicited Wall Recycling's business. Communications between Wall

11

and Padula continued thereafter, and in December 2018, Wall and Padula reached the material terms of an agreement while together in Wall's office in Raleigh." (Doc. 12 at 8-9; see also Doc. 12-1 ¶¶ 13-18.)

At this juncture, "factual conflicts must be resolved in favor of the party asserting jurisdiction for the limited purpose of determining whether a *prima facie* showing has been made." Vision Motor Cars, 981 F. Supp. 2d at 468 (citation omitted). Construing the evidence in the light most favorable to Wall, the court finds that Wall has plausibly stated that 3TEK initiated contact with Wall, thereby reaching into North Carolina to solicit business. This third factor weighs in favor of exercising jurisdiction.

The fourth factor, whether 3TEK deliberately engaged in significant or long-term business in North Carolina, is also disputed. 3TEK states that it "has not deliberately engaged in any significant or long-term business activities in North Carolina," (Doc. 7 at 14), and the record before the court does not reveal the extent or nature of 3TEK's business in North Carolina before the events giving rise to the present litigation. Wall responds that even this single contract can evince a "substantial connection" to North Carolina due to its size -- $2.3 million -- and the possibility of a long-term relationship. (Doc. 12 at 9-10.) Specifically, Dan Wall states that because the shredder was unique, Wall would be required to purchase replacement

12

parts exclusively from 3TEK over the course of the product's expected ten-year life and notes that 3TEK offered Wall a $15,000 credit during contract negotiations for this very purpose. (Doc. 12-1 ¶¶ 28-29.)

3TEK is correct that the alleged contract by its terms contemplated a more limited relationship, i.e., a single sale whose activity in North Carolina was limited to final assembly of the shredder and one to two weeks of on-site training. (Doc. 14 at 4; see also Doc. 12-1 at 12.) Nevertheless, given the nature of the goods involved, it was certainly foreseeable that by this sale 3TEK would have future contacts in North Carolina. The shredder was an expensive, proprietary piece of equipment. (Doc. 2 ¶ 12; Doc. 12-1 ¶ 27.) The express warranty was for potentially 14 months (Doc. 12-1 at 21) and Dan Wall has stated that he expected the shredder to last ten years (id. ¶ 29), a contention 3TEK did not dispute. If that is the case, it is foreseeable that 3TEK would have future shipments of parts into North Carolina and assembly therein, possibly for as long as ten years and at substantial cost. A contract for the shredder thus would not create a relationship with North Carolina that is based on merely "attenuated" contacts but points to a more substantial, long-term connection. See Burger King, 471 U.S. at 475.

The fifth factor is whether the parties contractually agreed that the law of North Carolina would govern disputes. The

13

existence of a contract, of course, is disputed in this case. However, there is nothing to indicate that the parties agreed that North Carolina law would govern. Wall signed the Quotation, which does not contain a choice-of-law provision. (See Doc. 12-1 at 11-21.) 3TEK's standard sales contract, however, does contain a choice-of-law provision in favor of Texas law. (Doc. 6-7 at 5; Doc. 7 at 14.) Wall did not sign that standard contract, although the company circulated proposed revisions to it. (Doc. 2 ¶ 28; Doc 6-8.) As 3TEK states, and Wall does not dispute, none of the proposed revisions objected to the Texas choice-of-law provision. (See Doc. 7 at 15.) In any event, it is Wall's contention that the Quotation constituted a binding contract and did not require Wall to sign 3TEK's standard sales contract, and that even if it did, 3TEK waived this requirement by its conduct. (Doc. 2 ¶¶ 27-29.) Viewed in the light most favorable to Wall, it cannot be said that the parties contractually agreed to a Texas -- or any other state -- choice-of-law provision.

The final three factors focus on the nature and extent of the parties' interactions, including performance of the contract. According to Dan Wall, Bill Padula made three in-person visits to Wall's facility in North Carolina, specifically in October 2018, December 2018 -- at which point, Wall alleges, the parties reached a "handshake agreement" on the terms of a deal -- and January 2020. (Doc. 12-1 ¶¶ 15, 18, 24.) Wall alleges that he signed 3TEK's

14

offer while in North Carolina and returned it to 3TEK. (Id. ¶ 20.) In addition, the parties engaged in various communications over email, phone, and text message about the agreement during this time period. (Doc. 7 at 17-18; Doc. 12 at 11.) Finally, it appears that the shredder was to be manufactured primarily in Texas before being shipped to Wall in North Carolina for final assembly for up to five days, plus one to two weeks of on-site training. (Doc. 12-1 at 12; Doc. 14 at 4.)

Any one of these facts would be insufficient to confer jurisdiction. A course of correspondence, some of which reaches the forum state, is not enough. See Consulting Eng'rs Corp., 561 F.3d at 281 (the "exchange of four brief emails, several telephone conversations . . . and the exchange of the various drafts" do not confer jurisdiction over a nonresident defendant based in India who did not initiate contact nor even visit plaintiff's home state). Nor are limited in-person visits to the forum state during contract negotiations shorn of additional facts. See Worldwide Ins., 2006 WL 288422, at *5 (no jurisdiction in North Carolina when defendant visited North Carolina only a single time, the rest of the contract was negotiated in defendant's home state of Georgia or over the phone, and all of defendant's work was to be performed in Georgia).

But the court is not limited to any single fact and must consider all the relevant factors. See Consulting Eng'rs Corp.,

15

561 F.3d at 278 (noting that the purposeful availment inquiry "is not susceptible of mechanical application" and providing the eight non-exclusive factors to consider in the business context). Having done so, the court finds that, at this juncture, Wall has made out a *prima facie* case as to the exercise of personal jurisdiction over 3TEK. 3TEK is based in Texas and does not own property or have an office or agents in North Carolina. However, construing the evidence in the light most favorable to Wall and "draw[ing] the most favorable inferences for the existence of jurisdiction," as the court is bound to do at this stage, see Combs, 886 F.2d at 676, it can be fairly said that 3TEK "purposefully directed" its activities toward North Carolina, see Pan-Am., 825 F. Supp. 2d at 683. Wall alleges that "3TEK pursued Wall Recycling as a potential customer" in the form of repeated calls and requests for meetings and three in-person visits. (Doc. 12 at 8.) According to Dan Wall, he initially declined 3TEK's requests before finally accepting an offer to meet in North Carolina. (Doc. 12-1 ¶ 14.) Wall further states the parties negotiated while in North Carolina such that they came to a "handshake agreement," (id. ¶ 18), and that he later signed the alleged contract in North Carolina (id. ¶ 20). The contract was for a $2.3 million proprietary shredder that would be partially completed in North Carolina, and for which, Wall alleges, Wall would be required to go to 3TEK for replacement parts and services for the lifespan of the shredder -- up to ten

16

years.  (Id. ¶¶ 23-29.)  While 3TEK's standard sales contract contained a Texas choice-of-law provision, it does not appear from the record before the court that the parties ever signed a contract with that provision.  (See Doc. 6-7 at 5; Doc. 2 ¶ 28.)

In sum, it can be fairly said that 3TEK "reached into" North Carolina -- in the form of communications and visits spanning over a year -- to solicit a multi-million-dollar contract that could have led to further business for up to ten years had the deal gone through.  Pan-Am., 825 F. Supp. 2d at 680.  The court thus finds that the first prong of the personal jurisdiction analysis, purposeful availment, is met here, at least for the purposes of a *prima facie* case.

The second and third prongs are more easily addressed.  As to the second prong -- whether Wall's claims arise out of 3TEK's activities directed at North Carolina -- it is clear that they do. Wall brings a breach of contract claim for a contract that allegedly comes from the very contacts that form the basis of 3TEK's activities into North Carolina.  In other words, it is precisely because of 3TEK's targeted activities into North Carolina that the alleged contract was created and then breached.

The third prong -- whether exercising personal jurisdiction could be "constitutionally reasonable" -- requires the court to consider if litigation is "so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison

17

to his opponent." <u>CFA Inst.</u>, 551 F.3d at 296 (quotations and citations omitted). The court should also consider the interests of North Carolina as the forum state and Wall's interest in obtaining relief. <u>See</u> <u>id.</u> These considerations also weigh in favor of exercising personal jurisdiction here. It would not be "gravely difficult" for 3TEK to litigate in North Carolina; after-all, 3TEK had prior in-person visits to North Carolina to negotiate the alleged contract. <u>Cf.</u> <u>id.</u> at 296 (no grave difficulty in requiring a company based in India to litigate in Virginia on the facts presented). Finally, North Carolina has a valid interest in the resolution of disputes involving its businesses, especially when North Carolina law is potentially involved, and Wall clearly has an interest in obtaining any possible relief.

Accordingly, the court finds that Wall has made out a *prima facie* case of specific personal jurisdiction over 3TEK, and 3TEK's motion to dismiss is therefore denied as to that ground.

**B. Motion to Dismiss Pursuant to Rule 12(b)(6)**

3TEK next moves to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 6 ¶ 4.) Specifically, 3TEK argues that Wall has failed to plausibly allege a breach of contract because there was no contract between the parties. (Doc. 7 at 19.)

A motion to dismiss under Rule 12(b)(6) is meant to "test[]

18

the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). "Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations to raise a right to relief above the speculative level so as to nudge the claims across the line from conceivable to plausible." Sauers v. Winston-Salem/Forsyth Cty. Bd. of Educ., 179 F. Supp. 3d 544, 550 (M.D.N.C. 2016) (alterations and quotations omitted). In reviewing a 12(b)(6) motion, the court may "consider documents attached to the complaint, see Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

As a threshold matter, the parties debate which state's law

should apply to Wall's breach-of-contract claim. (Doc. 7 at 19;
Doc. 12 at 14-16.) They do not appear to have agreed to a choice-
of-law provision. When a federal court sits in diversity, the
court applies the forum state's choice-of-law rule. Klaxon Co. v.
Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). In North
Carolina, for claims for breach of contract, in the absence of an
agreement between the parties, North Carolina law applies to
"transactions bearing an appropriate relation to this State." N.C.
Gen. Stat. § 25-1-301(b). North Carolina courts have interpreted
this provision to mean the applicable law is that of the state
with the "most significant relationship" to the contract. See
Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F. Supp. 345, 352
(M.D.N.C. 1995) (citing Boudreau v. Baughman, 368 S.E.2d 849, 855
(N.C. 1988)).

The court need not decide at this juncture whether North
Carolina or Texas is the state with the "most significant
relationship" to the claim and, hence, which state's law will
apply. The material requirements for contract formation appear to
be the same in either state.[6] See Vault, LLC v. Dell Inc., No.

---

[6] Compare USAA Texas Lloyds Co. v. Menchaca, 545 S.W.3d 479, 501 n.21
(Tex. 2018) (elements of a valid contract under Texas law are offer,
acceptance, a meeting of the minds on the essential terms of the contract
(mutual assent), each party's consent to the terms, and execution and
delivery of the contract with the intent that it be mutual and binding),
with Se. Caissons, LLC v. Choate Constr. Co., 784 S.E.2d 650, 654 (N.C.
Ct. App. 2016) (North Carolina law requires offer, acceptance,
consideration, and mutuality of assent to the contract's essential terms
to form a valid contract).

20

1:18CV00633, 2019 WL 113726, at *5 n.7 (M.D.N.C. Jan. 4, 2019)
("[W]hen the resolution of a choice-of-law determination would not
alter the disposition of a legal question, a reviewing court need
not decide which body of law controls." (citation omitted)). The
parties likewise direct their contract-formation arguments to
these essential requirements, with Wall specifically alleging that
under either Texas or North Carolina law a contract was formed.
(Doc. 12 at 16-21.) The court will thus analyze Wall's breach-
of-contract claim under North Carolina law. See Vault, 2019 WL
113726, at *5 n.7.

The alleged contract between the parties is governed by
Article 2 of the Uniform Commercial Code ("UCC") as it concerns
the sale of goods. See N.C. Gen. Stat. § 25-2-102. "The Uniform
Commercial Code applies more liberal rules governing the formation
of contracts than the rules applied under traditional common law."
Neugent v. Beroth Oil Co., 560 S.E.2d 829, 834 (N.C. App. 2002)
(quoting Fordham v. Eason, 521 S.E.2d 701, 705 (N.C. 1999)). Under
the UCC, "[a] contract for sale of goods may be made in any manner
sufficient to show agreement, including conduct by both parties
which recognizes the existence of such a contract." N.C. Gen.
Stat. § 25-2-204(1); id. § 25-2-207(3) ("Conduct by both parties
which recognizes the existence of a contract is sufficient to
establish a contract for sale although the writings of the parties
do not otherwise establish a contract."). "Even though one or

21

more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Id. § 25-2-204(3).

Wall argues that the Quotation the parties signed in February 2019 is an enforceable contract for a NEXT Shredder. (Doc. 12 at 16-21.) However, the Quotation appears to be just that -- a quote. The document is titled "RE: NEXT 6280 with Mobile Downstream Quotation," and the first line reads "Attached is the quote requested for our NEXT 6820 Shredder." (Doc. 12-1 at 11.) In general, price quotations are not offers. See J.D. Fields & Co. v. U.S. Steel Int'l, Inc., 426 F. App'x 271, 276 (5th Cir. 2011); Audio Visual Assocs., Inc. v. Sharp Elecs. Corp., 210 F.3d 254, 259 (4th Cir. 2000) (applying the UCC as adopted in Maryland and concluding "[w]ithout more, [price quotations] amount to an invitation to enter into negotiations, but generally they are not offers that can be accepted to form binding contracts"). However, if a price quotation is sufficiently detailed, it can constitute an offer capable of acceptance. See U.S. Steel, 426 F. App'x at 276; 77A C.J.S. Sales § 43 (2019) ("[P]rice quotations may be 'offers,' if they are sufficiently definite, in that they include a description of the goods and the quantity, price, delivery terms, and the time the price would be held, and only the buyer's assent is necessary to form a binding contract."). For this to be the

22

case, "it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract." <u>U.S. Steel</u>, 426 F. App'x at 277 (citation omitted). If the price quote contains language that "would condition the formation of a contract on some further step," <u>id.</u> at 279, or "is expressly qualified by statements that . . . look[] toward some future contract," 77A C.J.S. Sales § 43 (2019), then it is unlikely to constitute an offer.

Here, the Quotation was considerably detailed. It came after almost a year of conversations between Wall and 3TEK. It was transmitted only to Wall. <u>See Restatement (Second) of Contracts</u> § 26, cmt. c ("In determining whether an offer is made relevant factors include the terms of any previous inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom a communication is addressed."). It included: 1) price; 2) quantity; 3) detailed product specifications; 4) shipping and assembly details; 5) payment terms; 6) warranty information; and 7) a validity period. Under the liberal UCC contract-formation rules, this would likely be enough to constitute a valid offer that Wall could accept. <u>See U.S. Steel</u>, 426 F. App'x at 278 n.6 (collecting cases where similarly detailed price quotations were valid offers and noting the "UCC tolerates a great deal of incompleteness and even contradiction in offer and acceptance").

However, and importantly, the Quotation also required the

23

execution of a separate sales contract and stated that it expired
at the end of 2019 if Wall did not pay the remainder of its deposit
and sign this separate contract, i.e., the Quotation was "expressly
qualified by statements that . . . look[] toward some future
contract." See 77A C.J.S. Sales § 43 (2019). In full, the relevant
provision reads:

> If 3TEK receives a signed Sales Contract with deposit
> from another customer, we will extend to Elite Waste
> Services seventy-two (72) hours to determine your course
> of action. If for example you elect to take the second
> slot, then 1.) Signing of the 3TEK Sales Contract will
> be required; 2.) Payment of the balance of the initial
> 20% will be due and payable; and 3.) A finalized ready
> to ship date from 3TEK will be pledged. If you elect to
> pass, then your name will be attached to the next
> machine.

(Doc. 12-1 at 12) (emphasis added). Even read in the light most
favorable to Wall, the Quotation appears by its terms to be a
separate agreement, i.e., that in return for Wall paying the first
$100,000 of its deposit, 3TEK would give Wall a right of first
refusal for a future shredder. The Quotation itself expressly
stated that a separate sales contract and deposit would be required
in order to receive the shredder if Wall exercised this right. In
other words, it does not "reasonably appear from the price quote
that assent to the quote is all that is needed to ripen the offer
into a contract" since additional requirements were included. See
U.S. Steel, 426 F. App'x at 277 (emphasis added). And it is
undisputed that Wall did not sign 3TEK's separate sales contract,

24

despite the parties exchanging proposed revisions.

Nevertheless, Wall contends that 3TEK waived the requirement of this separate sales contract in its course of dealing with Wall. (Doc. 12 at 20-21.)

Waiver is "an intentional relinquishment or abandonment of a known right or privilege." Ernst v. N. Am. Co. for Life & Health Ins., 245 F. Supp. 3d 680, 687 (M.D.N.C. 2017) (quoting Bombardier Cap., Inc. v. Lake Hickory Watercraft, Inc., 632 S.E.2d 192, 196 (N.C. App. 2006)). Waiver may be express or "may arise from the acts and conduct of the party which would naturally and properly give rise to an inference that the party intended to waive the agreement." Guerry v. Am. Tr. Co., 68 S.E.2d 272, 275 (N.C. 1951). There is no allegation of express waiver of the requirement of a separate sales contract. Instead, Wall alleges that 3TEK waived through its conduct. (Doc. 12 at 20-21.) In reply, 3TEK states that Wall "cannot plead waiver as an affirmative claim." (Doc. 7 at 22 n. 4; Doc. 14 at 7.)

But 3TEK misconstrues Wall's position. Wall is not "pleading" waiver -- Wall is pleading breach of contract.[7] Wall is alleging that the Quotation became a binding contract for the sale of a

_____

[7] This distinguishes Ernst v. N. Am. Co. for Life & Health Ins., 245 F. Supp. 3d 680 (M.D.N.C. 2017), cited by 3TEK. There, the plaintiff pled both breach of contract and a separate claim for "estoppel/waiver." Id. at 684. This court found that the waiver "claim" was "no more than a restatement of [plaintiff's] contract claim" and dismissed it. Id. at 687. Here, Wall brings a claim for breach of contract, not for "waiver."

25

NEXT Shredder and, to the extent the Quotation required a separate contract, 3TEK waived that requirement. (Doc. 12 at 20-21.) "[T]he concept of waiver [is] . . . designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction." 13 Williston on Contracts § 39:15 (4th ed.) (emphasis added). Wall alleges that "3TEK waived the requirement [of a separate sales contract] through its conduct." (Doc. 2 ¶ 29.) Wall alleges that "the issue of a sperate sales contract was dropped by 3TEK." (Id. ¶ 28.) Specifically, Wall claims that 3TEK "pledged a firm delivery date, continued to provide Wall Recycling updates regarding the manufacture of the second NEXT Shredder, accepted Wall Recycling's deposit, and repeatedly acknowledged Wall Recycling's right to the second delivery slot for a NEXT Shredder, without requiring Wall Recycling to execute 3TEK's standard sales contract." (Id. ¶ 29.) These are factual questions that the court, restricted in its review to the complaint and limited attached materials, cannot resolve at this juncture.[8]  To be sure, at least some of these

---

[8] Each party has provided, in the form of declarations and supporting exhibits, conflicting facts as to waiver. However, because a motion to dismiss "tests the sufficiency of a complaint," see Martin, 980 F.2d at 952, the court is "generally limited to a review of the allegations of the complaint itself." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165-66 (4th Cir. 2016).  A court can consider documents explicitly incorporated into the complaint by reference or attached as exhibits,

26

allegations are equally consistent with 3TEK performing under the
terms of the Quotation as they are with waiver.[9]  However, if it
is true that 3TEK "dropped" the issue of a separate sales contract
and "repeatedly acknowledged" Wall's right to a shredder "without
requiring Wall Recycling to execute 3TEK's standard sales
contract," then Wall has at least pled facts that, taken as true
at the motion to dismiss stage, plausibly allege waiver of the
separate sales contract.  (Doc. 2 ¶¶ 28-29.)  Given the detailed
terms of the Quotation and the UCC's liberal contract-formation
rules, see N.C. Gen. Stat. §§ 25-2-204(1), 25-2-207(3), the
combination of the Quotation and subsequent actions plausibly
state a valid contract.  While the court finds Wall's complaint
survives the relatively low hurdle of plausibility, it remains to
be determined whether Wall's version of the facts (in the face of

---

as well as documents submitted by the party moving for dismissal but
only if the document was integral to the complaint and there is no
dispute about its authenticity.  See id. at 166.  Despite the potentially
sweeping language, that last category -- documents attached by the moving
party -- is very narrow.  It includes, for example, a document that forms
the basis of plaintiff's fraud claim and which plaintiff explicitly
references in its complaint, but which was provided by the defendant in
its motion to dismiss and not by the plaintiff.  See Am. Chiropractic
Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004).
Here, the court can consider the Quotation, which was expressly
referenced in Wall's complaint (see Doc. 2 ¶¶ 10, 20-22) and whose
authenticity is not in dispute, but it will not consider the parties'
dueling exhibits, such as emails and declarations about the meaning of
the Quotation or whether waiver occurred.  Such factual disputes must
be resolved another day.

[9] For example, 3TEK's providing a delivery date and Wall's payment of
the remainder of its deposit were required under the Quotation for Wall
to be eligible to exercise its right of first refusal.

express contrary language of the Quotation), if believed, is sufficient to make out a *prima facie* claim. <u>See</u> <u>Wright v. North Carolina</u>, 787 F.3d 256, 264 n.4 (4th Cir. 2015) ("The Supreme Court has admonished courts not to confuse evidentiary standards that govern plaintiffs' burden at summary judgment with the liberal pleading requirements established by Rule 8(a) of the Federal Rules of Civil Procedure.").

### C. Motion to Transfer

Finally, 3TEK moves in the alternative for a transfer of venue to the Northern District of Texas. (Doc. 6 ¶ 5.)

The federal transfer statutes provides that, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). In considering a motion to transfer under § 1404(a), a court weighs the following discretionary factors:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in

a forum that is at home with the state law that must
govern the action; and (11) avoidance of unnecessary
problems with conflicts of laws.

Speed Trac Techs., Inc. v. Estes Express Lines, Inc., 567 F. Supp.
2d 799, 802 (M.D.N.C. 2008). The moving party bears the burden of
proving that the balance of factors weighs in favor of transfer.
Id. "[A] plaintiff's choice of forum is given considerable weight
and, 'unless the balance is strongly in favor of the defendant,
the plaintiff's choice of forum should rarely be disturbed.'"
Vient v. Sanford Herald, No. 1:19CV2, 2020 WL 4572711, at *4
(M.D.N.C. Aug. 7, 2020) (quoting Collins v. Straight, Inc., 748
F.2d 916, 921 (4th Cir. 1984).

3TEK devotes relatively little space in its briefs arguing
for transfer and centers its argument on the fact that the unsigned
sales contract contained a Texas choice-of-law provision. (See
Doc. 14 at 8 ("The dispositive issue here is that the Parties, by
way of the Sales Agreement, contemplated that any disputes arising
between them would be settled in Texas.").) As discussed above,
the parties did not sign this separate contract, so it is not at
all clear that they "contemplated" that any disputes would be
resolved in Texas. The balance of the other factors weighs against
transfer. In particular, Wall initially filed this action in
Durham County Superior Court, which is in the Middle District of
North Carolina, and there is nothing to indicate that this choice
should be disturbed. Cf. Speed Trac, 567 F. Supp. 2d at 803

29

(plaintiff's initial choice of forum receives less weight if the plaintiff chooses a foreign forum or the cause of action bears little or no relation to the chosen forum). There is also no reason to believe that access to witnesses or other logistical issues regarding a fair trial would favor another district. Indeed, as Wall notes, it appears that one of 3TEK's principal witnesses, Mr. Padula, is located in South Carolina, which is closer to this district. (<u>See</u> Doc. 12 at 24.) Accordingly, 3TEK's motion to transfer venue will be denied.

## III. CONCLUSION

For the reasons stated above,

IT IS THEREFORE ORDERED that Defendant 3TEK Global, LLC's motion to dismiss or, in the alternative, to transfer venue (Doc. 6) is DENIED.

                                       /s/    Thomas D. Schroeder
                              United States District Judge

October 28, 2020