```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WALL RECYCLING, LLC,          )
                              )
            Plaintiff,        )
                              )
      v.                      )          1:20cv371
                              )
3TEK GLOBAL, LLC,             )
                              )
            Defendant.        )
```

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This is an action alleging breach of contract for the sale of an industrial metal recycling shredder. Before the court is the motion of Defendant 3TEK Global, LLC ("3TEK") for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 40.) Plaintiff Wall Recycling, LLC ("Wall") has filed a response in opposition. (Doc. 50.) 3TEK has also filed a motion to strike and objections to the declaration of Daniel Wall. (Doc. 56.) Wall opposes this motion. (Doc. 58.) For the reasons set forth below, 3TEK's motion to strike will be denied and its for summary judgment will be granted.

## I.  BACKGROUND

The facts, either not in dispute or viewed in the light most favorable to Wall as the non-moving party, establish the following:

Wall is a recycling company based in central North Carolina. (Doc. 2 ¶ 8.) 3TEK manufactures scrap metal processing equipment,

including a large industrial NEXT 6280 shredder (the "NEXT shredder"), which is the subject of this dispute. (Id. ¶¶ 2, 9.) In April 2018, at an industry convention in Las Vegas, Nevada, Dan Wall, owner of Wall, met Bill Padula, 3TEK's Vice President of Sales, and discussed the NEXT shredder. (Doc. 41-1 at 1 ¶ 3.) At that time, 3TEK had not completed the fabrication of a NEXT shredder, nor had it installed a shredding system with any customer. (Id. at 1-2 ¶ 4.)

In December 2018, following several months of discussions between Dan Wall and Padula, Dan Wall signed an agreement with 3TEK on behalf of Elite Waste Services, Wall's predecessor, that "provided options to purchase" two mobile shredders, and Wall paid a $100,000 deposit. (Doc. 51-1 at 3 ¶ 5.) In February, Wall decided to purchase a downstream system for the 3TEK shredder, which sorts the material after it is processed; so, on February 28, 2019, 3TEK sent Wall an 11-page letter captioned, "RE: NEXT 6280 with Mobile Downstream Quotation" ("the February Agreement"), which Wall countersigned. (Id. at 15-25.) Wall's prior $100,000 deposit was applied to the February Agreement. (Id. at 16.) While Wall contends, and 3TEK denies, that the February Agreement constitutes a valid contract for the sale of a NEXT shredder, the February Agreement does set forth Wall's intent to purchase a NEXT shredder and downstream system for $2,299,500, and states that "[c]urrently" the available NEXT shredder would "be ready for

2

shipment in July, of 2019." (Doc. 41-1 at 8, 17.) The February Agreement contains a significant amount of specific information about 1) price; 2) quantity; 3) detailed product specifications; 4) shipping and assembly; 5) payment terms; 6) warranty information; and 7) a validity period for the right of first refusal at the price offered through December 2019. (Id. at 7-17.)

The NEXT shredder was a newly-developed product at the time, which Wall understood. (Doc. 41-2 at 145:14-21.) 3TEK maintains that it completes each NEXT shredder to the same specifications and then distributes the machine on a first-come, first-served basis while it is being manufactured. (Doc. 41-1 at 1-2 ¶ 4.) However, the February Agreement offered Wall a right of first refusal for the second and sixth NEXT shredder production slots under the following conditions:

> If 3TEK receives a signed Sales Contract with deposit from another customer, we will extend to Elite Waste Services seventy-two (72) hours to determine your course of action. If for example you elect to take the second slot, then 1.) Signing of the 3TEK Sales Contract will be required; 2.) Payment of the balance of the initial 20% will be due and payable; and 3.) A finalized ready to ship date from 3TEK will be pledged. If you elect to pass, then your name will be attached to the next machine.

(Doc. 41-1 at 8.)

On April 18, 2019, Padula emailed Wall that the customer holding the third production slot had come forward with its full

deposit, meaning Wall could exercise its right of first refusal for the second production slot. (Doc. 53-2 at 2.) Padula emailed Dan Wall and informed him that to exercise Wall's right of first refusal, Wall would need to wire the balance of its 20% deposit and sign a 3TEK Sales Contract ("the Sales Contract"), which was attached to the email.[1]  (Id.)  Padula advised Dan Wall that the machine would not be ready by July (as earlier referenced in the February Agreement) and wrote that "[i]f you choose this path then 3TEK will pledge a firm shipment date in September of 2019." (Doc. 51-1 at 4 ¶ 12; Doc. 53-2 at 2.)  Dan Wall expressed his discontent with this delivery timeframe, noting he was losing substantial profits not being able to sell shredded metal at a higher value, which the machine would enable him to do.  (Doc. 51-1 at 4 ¶ 12.) According to Dan Wall, Padula responded that the shredder would be ready for shipment "by the end of September 2019, and that this was a conservative, safe date for [Wall] to plan around."  (Id.) Dan Wall says that "Padula offered that 3TEK could include a 10% reduction in the sales price for the shredder if 3TEK could not delivery [sic] it by the end of the year."  (Id. at 4-5 ¶ 13

---

[1] The Sales Contract differs substantially from the February Agreement. For example, it sets forth additional terms, including choice of law provisions, limitations of liability, and allocations of the obligations of both parties, and it notes that the delivery schedule is "approximate[]" and subject to revision.  (Doc. 53-2 at 14-19.)

(emphasis added).)[2]  Wall chose to exercise its right of first refusal.  (Id. at 5 ¶ 14.)

Wall wired the remaining balance of the 20% deposit to 3TEK -- $359,900.  (Id.)  However, Wall did not sign and return the Sales Contract.  Instead, on April 19, 2019, Wall's Chief Financial Officer, RJ Smith, sent 3TEK a redlined version of the Sales Contract with Wall's "proposed revisions," which included several proposed revisions including a 10% penalty if 3TEK failed to deliver the NEXT shredder by the end of 2019.  (Doc. 53-3.)

Padula emailed Smith on April 23, 2019, to schedule a phone call to discuss the proposed revisions to the Sales Contract. (Doc. 53-1 at 103:1-25.)  Specifically, Padula advised "I'm following up on this lose [sic] end.  Wanting to get this document signed as we move closer."  (Id.)  Yet for over a month, neither Smith nor Wall responded, and no progress was made on finalizing the Sales Contract.

---

[2]  Though Dan Wall was deposed, this statement is contained in a declaration he later filed and, as noted infra, is based on the written correspondence between 3TEK and Wall's RJ Smith in May 2019, whose authenticity is not disputed and which contradicts it in so far as 3TEK's willingness to assent to the request was conditioned on further agreement by Wall, which was never received.  The court therefore need not accept Wall's testimony on this point to the extent it contradicts the written record.  See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 526 (4th Cir. 2003) (noting it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial" (citation and internal quotation marks omitted)).

Padula, after having Matthew Morrison, President of 3TEK, review Wall's proposed revisions, and not having heard back from Wall or Smith for over a month, responded to Wall's proposed 10% reduction penalty with a May 30 email as follows:

> I am following up on this loose end to get this document signed as we move closer. As you may recall, our intentions are not that far apart. We are happy to comply with a delivery penalty <u>as long as you take equal responsibility for timely completion on your responsibilities to insure a timely installation</u>.
>
> No huge rush here, but let's see if we can dust this off and bring acceptable closure.

(Doc. 52-1 at 2 (emphasis added).)[3] Smith responded about an hour later, "Yes, I think we were <u>very close to agreement</u> – I've been buried in other projects so I apologize for the delay. Let me chat with Dan about this and I'll get a response to you." (Doc. 40 at 8 (emphasis added).)[4] Unfortunately, Smith never responded, and Wall terminated Smith's employment thereafter, although not until November 2019. (Doc. 41-2 at 132:12-16.) Neither Dan Wall nor anyone at Wall ever sent a response to Padula.[5]

---

[3] Such responsibilities of Wall would include ensuring it timely obtained proper environmental and other permits and that the site is ready. (Doc. 51-8 at 5-6.)

[4] 3TEK includes Smith's email in its motion for summary judgment memorandum and cites to Wall deposition exhibit 13. There is one reference to Wall deposition exhibit 13 on ECF, but that exhibit does not include the email 3TEK cites. (<u>see</u> Doc. 52-2.) Nevertheless, the parties do not dispute or contest the email's contents or authenticity.

[5] Dan Wall states in his declaration that he spoke to Smith and has an "understanding" that Padula told Smith that "3TEK was willing to include

Between May and early October 2019, Padula informed Dan Wall of numerous delays in the production of the NEXT shredder. (Doc. 51-1 at 6 ¶ 19.) Despite these delays, Padula insisted that the Shredder was "almost done" and that it would be "ready shortly." (Id.) On October 3, Wall confronted Jonathan Maly, a sales representative for Granutech-Saturn Systems, an owner of 3TEK, at a trade show and complained about his dealings with 3TEK, Padula, and Morrison. (Doc. 51-1 at 7 ¶ 24.)

On October 9, 2019, citing 3TEK's failure to meet the June date noted in the February Agreement and the shipment date in September stated in Padula's April 18 email, Wall emailed Padula, "I am requesting my deposit back in full." (Doc. 52-3 at 4.) Dan Wall explained, "[a]ll in all, I think you are making a great machine and I will definitely keep you and 3Tek [sic] in mind for the future, but at this point I cannot afford to wait any longer." (Id.) He added: "Please get me in touch with the appropriate person and I will provide my wiring instructions. Thank you very much and I wish you guys the best of luck." (Id.)

_____

the 10% reduction to the sales price if the Shredder was not delivered to Wall Recycling by the end of the year." (Doc. 51-1 at 5 ¶ 16.) However, Wall's proposed testimony on his "understanding" based on what he says Smith told him that Padula said is inadmissible hearsay not within an exception. Fed. R. Evid. 801; Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). In his deposition, Dan Wall testified that the 10% penalty "was the part that Bill [Padula] said he had no problem with." (Doc. 41-2 at 193:21-194:9.) As the negotiations on this issue were between Smith and Padula, this testimony is obviously contrary to the record.

7

After not receiving an acknowledgement of his cancellation from 3TEK, Dan Wall emailed Padula on October 16, stating, "I have not heard back from you [sic] please answer me so I can get you my wiring info for the deposit to be sent back to [sic]. Thank you." (Id. at 2.)  3TEK's president, Morrison, responded with an email to Dan Wall the next day, stating:

> Please find attached the acknowledgement of your order cancellation with 3TEK for the 6280 Shredding System. Please send your wiring instructions to me so we can begin reimbursing your deposit per the attached letter.

(Id. at 2 (emphasis added).)  An attached letter from Morrison provided:

> 3TEK regretfully accepts your request to cancel the Sales Order from Wall Recycling dated February 21, 2019 regarding the purchase of a 6280 Shredding System per your email to Bill Padula on Wednesday October 9, 2019. 3TEK will reimburse the deposits made toward this purchase totaling $459,900.00 . . .

(Id. at 5.)  The letter went on to explain that 3TEK had invested over $1,000,000 in work-in-process toward the manufacture of Wall's shredding system and was thus unable to return Wall's full deposit at that time.  (Id.)  However, the letter stated 3TEK would wire $100,000 of Wall's $459,900 deposit to Wall immediately "once wiring instructions are confirmed," with the remaining to be sent when "3TEK secures a confirmed order from another customer on its waiting list."  (Id.)  The letter closed by stating, "We wish you the best of luck in your future endeavors and hope you will keep us in mind if you are in the market for a shredding system."  (Id.)

8

Thereafter, Wall never provided wiring instructions to Morrison or anyone at 3TEK or made any attempt to receive its deposit. (Doc. 41-2 at 156:7-20.)

In his declaration, Dan Wall states that in mid-October, sometime after Morrison's letter accepting Wall's request to cancel its sales order, he spoke with Maly, who advised that "3TEK wanted to keep [his] business," and that he "personally would work with me on behalf of 3TEK to ensure that the deal was completed." (Doc. 51-1 at 7 ¶¶ 25-26.) Dan Wall's earlier deposition testimony provides a slightly different context. He puts the conversation in November. (Doc. 41-2 at 161:25-163:5.) According to Mr. Wall, he initiated the conversation with Maly, who he did not know before, and "went up to them and pretty much called them crooks." (Id. at 165:4-16.) Wall says he was "not very polite" and was "quite irate" because he was "losing a lot of money and missed opportunity" and "they couldn't return my deposit." (Id. at 165:17-23.) Dan Wall "expressed [to Maly:] that I would – I wanted to buy the machine, I just did not want to deal with Bill Padula anymore, because I didn't like being misled constantly." (Id. at 161:25-162:12.) Maly assured him that the NEXT shredder would be complete before the end of 2019. (Doc. 51-1 at 7 ¶ 26.) Based on this, Dan Wall agreed to continue to move forward with the purchase of the shredder and withdrew his demand for refund of his deposit. (Id. at 8 ¶ 27.) Though Wall does not provide a date for this

9

exchange, on November 13, 2019, Maly followed up with an email to
Dan Wall:

> Dan,
>
> Could you do me a favor just so I have a bit of a record
> and I can make sure everyone up at corporate are on the
> same page. Can you send me an email stating that you
> are still intent on moving forward with the purchase of
> a 6280 that is being manufactured by the end of the year.
> The last communication that we have record of was that
> of the refund for the deposit. I just like to have t's
> crossed and I's dotted.

(Doc. 52-4 at 2.) Dan Wall, reflecting on his response, believes
Maly's email "prompted a phone call that was probably not the
nicest phone call either." (Doc. 41-2 at 167:18-23.) Dan Wall
added that he told Maly, "You guys have my money. Build my
machine." (Id. at 167:24-168:2.) However, Dan Wall did not
provide an email confirming his company's interest, as requested
by 3TEK.

On December 6, Maly and Dan Wall communicated by text
messaging. Maly assured that "All the pieces [of the shredder]
are done. It is definitely not months from being completed. I
can promise you that." (Doc. 52-5 at 3.) Dan Wall responded,
"Ok. Sounds good keep me posted. Really looking forward to seeing
it shred next month." (Id.) Maly responded that he would advise
of any changes, but he could "guarantee we are not months away
from shredding." (Id.) Maly added, "To protect you why don't I
come down the week of December 16th and we sign a commitment that

10

we have to pay a penalty if we don't deliver in January!" (Id.)

On December 10, Maly texted a photograph of the NEXT shredder with the note, "Tracks are being mounted." (Id. at 2.) Dan Wall responded, "Great," to which Maly responded, "Dan can we get a contract signed? More for your protection than [3TEK]. As I mentioned we put in a build clause so you are protected." (Id.) Dan Wall did not respond to this request.

The NEXT shredder was not completed by December 31, 2019, but 3TEK advised Wall that it would be ready to ship in January. (Doc. 51-1 at 10 ¶ 34.) 3TEK offered to assemble the shredder at no cost in Raleigh and give Wall a "$15,000 parts credit" for the delay. (Id.) No further action was taken by either party until February 6, 2020.

On February 6, 3TEK conducted a site visit at Wall's facility to discuss shipping arrangements, crane requirements, the site set aside for the NEXT shredder, and the assembly logistics. (Doc. 53-5 at 158:2-159:7.) During this visit, 3TEK representatives, including Padula and Maly, did not raise the need for a completed Sales Contract. (Doc. 51-1 at 10 ¶ 35.)

On February 18, Dan Wall emailed Maly and Padula for an update on the machine. (Doc. 52-6 at 3 ("Where does the machine stand?).) The next day, February 19, Maly responded with an update that the machine was receiving "final electrical upgrades" and "being prepped for shipment." (Id. at 2.) Maly also noted he was

11

attaching an "updated version of the contract" for the NEXT shredder. (Id.; Doc. 51-1 at 10-11 ¶ 36.) This document resembles the February Agreement, however it is titled "RE: Bravo 6280 with Mobile Downstream" and does not include the right of first refusal language, but it does include 3TEK's concessions for $30,000 for assembly labor and a "full set of hammers," shipping details, and equipment specifications. (Doc. 53-11.) Maly requested that Wall review and email back a signed copy "at some point this week." (Id.) According to Dan Wall, he did not sign this agreement "because it didn't have the concessions in there that [3TEK] agreed upon in writing." (Doc. 41-2 at 175:25-176:24.) The only alleged concession not included in the letter was a 10% price reduction Wall contends 3TEK previously agreed to.

On February 19, 2020, the same day Maly emailed the updated contract to Dan Wall, Wall learned that 3TEK had sold the NEXT shredder in production slot 2 to another customer on 3TEK's waiting list and that Wall would be purchasing production unit three.[6] (Id. at 250:19-251:1; Doc. 53-13.) This prompted Dan Wall to contact 3TEK's customer and complain that the customer had purchased what Dan Wall contended should have been his machine. (Doc. 41-2 at 250:19-251:1.) As Dan Wall notes, he was "extremely" heated and "did show not a better side of me" when he called Maly

---

[6] 3TEK maintains that NEXT shredder production units two and three were produced in tandem with each another. (Doc. 53-12 at 2.)

to discuss what Wall perceived as 3TEK's dishonesty.  (Id. at 199:7-9; 209:2-3.)

Maly responded to Dan Wall in a February 20 email, explaining that when Wall cancelled its sales order in October, it "effectively lost your spot in line."  (Doc. 52-7.)  Maly also noted that when Dan Wall changed his mind and withdrew his request of the deposit, he was given the next spot, production unit 3, which was available "only a few weeks" after unit 2.  (Id.)  Maly reiterated that "[going] forward" he would need a "signed sales contract" and an "[i]nvoice paid which will be issued on Monday for 75%."  (Id.)  Referencing Wall's cancellation letter, which Maly attached, Maly closed by stating, "Honestly we want to make this relationship work but we need to get everything signed and in line."  (Id.)

The next day, February 21, 2020, Nancy Wall, Wall's legal counsel, emailed Maly, Padula, and Morrison, among others, "in the interest of trying to complete this purchase that we've been working on for over a year."  (Doc. 52-8 at 2.)  Nancy Wall noted three concessions that Wall Recycling was "asking for," which she stated "have been previously agreed upon and/or offered by 3TEK." (Id. at 2-3)  Specifically, she noted: a 10% reduction in the sales price for failing to deliver the NEXT shredder by December 31, 2019, citing a "5-30-2019" email (presumably Padula's email with his statement "we will agree if you also agree to complete your

13

duties in a timely fashion"); 3TEK's commitment it would assemble the machine at no cost to Wall; and a $15,000 parts credit, again referencing emails.[7]  (Id. at 3.)

Morrison replied by informing her that his "team will be reviewing your requests."  (Doc. 53-15 at 3.)  He also advised that the NEXT shredder was complete and ready for shipment and "3TEK and Wall Recycling do not have a fully executed Sales Contract for this transaction."  (Id.)  Nancy responded, noting Wall had not known the NEXT shredder was ready for shipment but agreeing with Morrison that "[t]here is no 'Sales Agreement' signed; there is a 'Sales Quote' signed."  (Id.)

On February 25, the relationship between Wall and 3TEK eroded significantly when Dan Wall threatened to sue 3TEK with "an army of lawyers."  (Id. at 2.)  Three days later, 3TEK sent Nancy Wall a letter that outlined its view that Wall had failed to finalize the Sales Contract but instead had "significantly revised" it without signature; cancelled the February Agreement in October 2019, which cancellation 3TEK accepted on October 17; and failed to send wiring instructions as requested by 3TEK.  (Doc. 52-17 at 2.)  3TEK further indicated that it was rejecting Wall's offer conveyed through Nancy Wall, and because 3TEK and Wall "never

---

[7] The referenced attachments to Nancy Wall's email do not appear in the record, as far as the court can discern.  It is unclear why Nancy Wall referenced the assembly and parts credits when they were already contained in 3TEK's February 6, 2020 contract.  (Doc. 52-6 at 4.)

reached an agreement for the purchase" of the NEXT shredder, 3TEK was returning Wall's deposit and would not be delivering a NEXT shredder system. (Id.) 3TEK included a check for $479,687.72, representing Wall's $459,900 deposit with an additional $19,787.72 as interest. (Id.) Wall then filed the present action for breach of contract in the General Court of Justice, Superior Court Division, Durham County, on April 24, 2020. (Doc. 2.)

3TEK removed the action to this court based on diversity jurisdiction and moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) or, in the alternative, to transfer the action to the United States District Court for the Northern District of Texas. (Docs. 1, 6.) On October 28, 2020, this court denied both motions. (Doc. 15.) 3TEK now moves for summary judgment. (Doc. 40.)

## II.  ANALYSIS

### A.   Applicable Law

At the motion to dismiss stage, the parties originally contested whether North Carolina or Texas law applied. (Doc. 7 at 19; Doc. 12 at 14-16.) The court deferred decision on which law was applicable, noting that the material requirements for contract formation were the same in both states.[8]

---

[8] Compare USAA Tx. Lloyds Co. v. Menchaca, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (elements of a valid contract under Texas law are offer, acceptance, a meeting of the minds on the essential terms of the contract (mutual assent), each party's consent to the terms, and execution and

In determining which state's substantive law applies, a federal court sitting in diversity applies the forum state's choice-of-law rule. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941). In North Carolina, for claims for breach of contract, in the absence of an agreement between the parties, North Carolina law applies to "transactions bearing an appropriate relation to this State." N.C. Gen. Stat. § 25-1-301(b). North Carolina courts have interpreted this provision to mean the applicable law is that of the state with the "most significant relationship" to the contract. <u>See</u> <u>Dassault Falcon Jet Corp. v. Oberflex, Inc.</u>, 909 F. Supp. 345, 352 (M.D.N.C. 1995) (citing <u>Boudreau v. Baughman</u>, 368 S.E.2d 849, 855 (N.C. 1988)).

The NEXT Shredder was to be placed in Raleigh, North Carolina, representatives from 3TEK visited the Raleigh site to plan logistics for moving the NEXT shredder to North Carolina, and contractual obligations were to be performed in North Carolina. Additionally, both parties now cite exclusively to North Carolina law. As such, this court will analyze Wall's breach of contract claim under North Carolina law.

**B.  Motion to Strike Dan Wall's Declaration**

3TEK seeks to strike portions of Dan Wall's declaration

delivery of the contract with the intent that it be mutual and binding), <u>with</u> <u>Se. Caissons, LLC v. Choate Constr. Co.</u>, 784 S.E.2d 650, 654 (N.C. Ct. App. 2016) (North Carolina law requires offer, acceptance, consideration, and mutuality of assent to the contract's essential terms to form a valid contract).

16

because it: 1) contradicts Wall's prior deposition testimony; 2) otherwise contains "objectionable" statements; and 3) contains "untimely expert testimony." (Doc. 56.) Wall argues that these arguments are meritless and urges the court to deny 3TEK's motion. (Doc. 58.)[9]

3TEK argues that Dan Wall's declaration contradicts his prior deposition testimony. (Doc. 56 at 3.) Wall responds by arguing that the declaration should not be struck as a sham declaration, because 3TEK "deliberately cherry picks" Wall's statements, which were intended to provide additional context. (Doc. 58 at 5.)

In order to disregard a declaration,[10] there must be a bona fide inconsistency between the declaration and the prior deposition testimony. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 n.7 (4th Cir. 2001). "No such inconsistency exists when the affidavit 'merely detail[s] and lend[s] context' to the prior testimony." Riggins v. SSC Yanceyville Operating Co., 800 F. App'x 151, 160 (4th Cir. 2020) (quoting Libertarian Party of Va. v. Judd,

_____

[9] As to the third argument, 3TEK contends that Dan Wall's declaration contains untimely expert opinions on damages because Wall designated only one damages expert, Robert Brewer, and not Dan Wall. (Doc. 56 at 2.) Because this issue is moot in light of the court's grant of summary judgment, the court need not reach it.

[10] Technically, the court does not strike declarations, as motions to strike are directed to pleadings. See Fed. R. Civ. P. 12(f). Rather, the court would elect not to consider any portion that is inconsistent with prior deposition testimony.

718 F.3d 308, 314 n.6 (4th Cir. 2013)).[11]

3TEK first points out that Dan Wall acknowledged during his deposition that the February Agreement required a separate Sales Contract between the parties. (Doc. 56 at 4.) It then points to his declaration, which stated:

> After I threated to sue 3TEK, 3TEK terminated the February Agreement purportedly on the grounds that Wall Recycling had not signed a Sales Contract, and returned Wall Recycling's deposit. 3TEK's position was a huge surprise to me. I had signed the February Agreement on behalf of Wall Recycling and I was not aware that any further contractual document needed to be signed.

(Doc. 51-1 at 11 ¶ 38.) Wall is correct that Dan Wall's two statements are not necessarily inconsistent.

Specifically, in Dan Wall's deposition, 3TEK's attorneys presented the February Agreement to him and read portions of it. (Doc. 41-2 at 122:2-20.) They then asked Mr. Wall whether there was "[a]nything unclear about that?" to which he replied "[n]o." (Id. at 19-20.) All this inquiry questioned was Mr. Wall's reading comprehension and whether he understood what was just read to him. However, the context of his declaration statement is different. There, Mr. Wall stated he "was not aware that any further contractual document needed to be signed" as of February 2020 when

---

[11] While the Fourth Circuit does not accord precedential value to its unpublished opinions, it has noted that they "are entitled only to the weight they generate by the persuasiveness of their reasoning." See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (citation omitted).

3TEK canceled Wall's NEXT shredder because no signed Sales Contract existed.  (Doc. 51-1 at 11 ¶ 38.)  It is not inconsistent for Mr. Wall to state his understanding as of February 2020 as compared to that immediately after reading the February Agreement.  This is especially true where Wall contends that at some point after February 2019 3TEK waived the Sales Contract requirement. Believing that 3TEK waived the requirement, Dan Wall could express his view that as of February 2020 no further agreement was required, despite the February Agreement expressly requiring one. As such, Dan Wall's declaration and deposition are not fatally inconsistent.

3TEK further argues that Dan Wall's declaration and deposition statements concerning two text messages from Maly are inconsistent.  (Doc. 56 at 5.)  Maly's first text message, sent December 6, 2019, stated that he would visit Wall's facility in North Carolina and "sign a commitment that [3TEK has] to pay a penalty if [3TEK does not] deliver in January!"  (Doc. 51-1 at 29.)  Maly then asked Dan Wall in his second text message, sent December 11, "Dan, can we get a contract signed?" which Maly stated was "[m]ore for [Wall's] protection than for Granutech," noting that 3TEK had "put in a build clause so [Wall is] protected."  (Id. at 32.)

In his deposition, when asked what he thought Maly meant when Maly asked "can we get a contract signed?" Dan Wall responded that

19

Maly was talking about "[s]igning a new agreement."  (Doc. 41-2 at
172:1-173:2.)  However, in his declaration, Dan Wall states:

> Again, [Maly] did not tell me that 3TEK
> <u>required</u> that I sign a further contract.  I
> understood this was something that 3TEK was offering
> to encourage me to not back out of the contract to
> purchase the Shredder given the on-going delays, but
> did not understand that a further contract was
> required to be signed.

(Doc. 51-1 at 9 ¶ 32 (emphasis added).)  Dan Wall's declaration
seems to provide explanation for the "new agreement" he referenced
in his deposition.  While his declaration testimony is different
from that in his deposition, it is not necessarily inconsistent.
Therefore, 3TEK has not shown that the court should disregard Dan
Wall's declaration.

3TEK's final argument against Wall's declaration is that many
of the statements "do not satisfy the standards for summary
judgment evidence."  (Doc. 56 at 7.)  Specifically, 3TEK contests
Wall's declared statements concerning Padula's various
representations as to when the NEXT shredder would be available to
ship, because they do not satisfy the statute of frauds.  (Id. at
7-8.)  Wall responds by noting that "[m]ost of the statements
identified by 3TEK do not relate to the contract terms upon which
Wall Recycling bases its breach of contract claim," therefore the
statute of frauds is not implicated.  (Doc. 58 at 11.)  As to the
other statements to which the statute of frauds might apply, Wall
replies, there is proper written evidence of these statements in

the record.  (Id. at 12.)

North Carolina's statute of frauds under the Uniform Commercial Code ("UCC") provides that "a contract for the sale of goods for the price of five hundred dollars . . . or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties."  N.C. Gen. Stat. § 25-2-201(1). "The statute of frauds requires that all essential elements of the contract be reduced to writing."  Powell v. City of Newton, 684 S.E.2d 55, 58 (N.C. Ct. App. 2009) (internal quotations and citations omitted).  Such a writing "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement . . . ."  N.C. Gen. Stat. § 25-2-202.

Wall's breach of contract claim is based upon 3TEK failing to have the NEXT shredder ready for delivery by the end of September 2019 and failing to deliver the NEXT shredder at subsequently promised times, 3TEK shipping the second production slot NEXT shredder to another buyer, and 3TEK's alleged repudiation of the February Agreement in February 2020.  (Doc. 58 at 11.)  Therefore, Padula's representations of delivery dates prior to September 2019, and Dan Wall's declaration on those representations, are not relevant to the breach of contract claim.  (Doc. 51-1 at 3 ¶ 6, 4 ¶ 10.)  As to his remaining representations (id. at 3-4 ¶¶ 13, 16, 10 ¶ 36), Dan Wall does not indicate whether he claims they were

21

oral or written statements, although the context suggests he is repeating his understanding of the contents of a writing. To the extent he intends them to be based on verbal statements, however, any testimony about a 10% reduction in the purchase price of the NEXT shredder for delivery delay would violate the statute of frauds if not based on a writing (e.g., Wall's proposed redline version of the Sales Contract, or an email or text message) and will be disregarded to that extent. N.C. Gen. Stat. § 25-2-201(1); see Jackson v. Cape Fear Turf Farm, Inc., 749 S.E.2d 110, at *2 (N.C. Ct. App. 2013) (noting that "under ordinary circumstances" an oral agreement between parties for the sale of goods is not enforceable unless the agreement is "in writing and signed by the parties").

The only dispute concerns two paragraphs of Dan Wall's declaration. First, Dan Wall states that Padula told him "that the Shredder would be ready for shipment by the end of September 2019, and that this was a conservative, safe date for [Dan Wall] to plan around." (Id. at ¶ 12.) 3TEK argues that, because the February Agreement is in writing and the only agreement between the parties, Dan Wall's declaration of an unwritten statement violates the statute of frauds. (Doc. 56 at 7.) However, there is written evidence in the record that Padula made this promise. For instance, Padula authored an email to Dan Wall on April 18, 2019, informing him that if Wall chose to exercise its right of

22

first refusal, "then 3TEK will pledge a firm shipment date in September of 2019." (Doc. 41-1 at 18.) To the extent Dan Wall is referring to and not contradicting these writings, therefore, there is no statute of frauds problem.

The second paragraph to which 3TEK objects is Dan Wall's statement that Maly "also assured [Dan Wall] that the manufacturing of the Shredder would be complete before the end of 2019." (Doc. 51-1 at 7 ¶ 26.) However, there is also written evidence in the record from 3TEK representatives conveying a manufacturing date by December 31, 2019. Maly emailed Dan Wall on November 13, 2019, asking Mr. Wall to send him an email with his intent to purchase a NEXT shredder which "is being manufactured by the end of the year." (Doc. 52-4 at 2.) Additionally, Maly represented in text messages to Dan Wall that Maly could "guarantee we are not months away from shredding" and the NEXT shredder would be manufactured in December and delivered in January 2020. (Doc. 52-5 at 3.) Again, to the extent Dan Wall is referring to and not contradicting these documents, these two paragraphs from his declaration do not violate the statute of frauds.[12]

Having resolved these evidentiary questions, the court turns to 3TEK's motion for summary judgment.

---

[12] Moreover, because the court finds that the February Agreement was mutually rescinded in October 2019, any alleged oral statement thereafter would not relate to Wall's claim, which only alleges breach of the February Agreement.

### C. Motion for Summary Judgment

#### 1. Standard of Review

A court must grant a motion for summary judgment if the pleadings, depositions, and affidavits submitted show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Under this standard, a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. As a result, the court will only enter summary judgment in favor of the moving party when the record "shows a right to judgment with such clarity as to leave no room for controversy" and clearly demonstrates that the non-moving party "cannot prevail under any circumstances." Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994) (internal quotation marks omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact-finder] functions . . . ." Anderson, 477 U.S. at 255. On summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id.

While the movant bears the initial burden of demonstrating

24

the absence of any genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate that a genuine dispute of material fact actually exists. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bouchat v. Balt. Ravens Football Club, Inc.</u>, 346 F.3d 514, 521 (4th Cir. 2003). A mere scintilla of evidence is insufficient. <u>Anderson</u>, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. <u>Id.</u> at 248-49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." <u>Mitchell v. Data Gen. Corp.</u>, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

### 2. Parties' Arguments

The parties present contrasting interpretations of the facts and their legal significance. Therefore, it is helpful to set forth the opposing views for clarity.

3TEK argues that Wall's claim fails at multiple points. First, 3TEK contends the February Agreement is not a contract to sell a NEXT shredder, but rather a sales quote. (Doc. 40 at 4.) Second, even if it is a contract, 3TEK argues, Wall terminated it on October 9, 2019, when Dan Wall emailed Padula and demanded return of his full deposit, which 3TEK confirmed on October 17. (<u>Id.</u> at 10.) Third, if Wall's actions did not constitute

25

termination of the contract, 3TEK further argues, Wall failed to sign the separate Sales Contract required by the February Agreement to purchase a NEXT shredder. (Id. at 6.) Fourth, although Wall contends that 3TEK waived this requirement by its course of dealing, 3TEK argues it did not and that even if it did, it reasonably retracted the waiver in February 2020. (Id. at 31.) Therefore, 3TEK contends, there was no operative contract after Wall's October termination of the February Agreement and Wall never signed a Sales Contract; rather, as of February 21, 2020, Wall was still attempting to negotiate a deal and 3TEK permissibly rejected Wall's offer to purchase a NEXT shredder on February 28.

Wall bases its contract claim on the February Agreement, which it contends "contains the essential terms to form a contract." (Doc. 50 at 3.) In fact, Wall contends it is the only binding contract between the parties. While Wall contends there were certain oral modifications to the February Agreement, the complaint refers to no other contract, oral or written, and Wall's response brief to 3TEK's motion for summary judgment contends "[t]here is no question that 3TEK breached the February Agreement." (Id. at 20.) Wall argues that at all times in the parties' business relationship, 3TEK was bound to sell Wall a NEXT shredder and breached the February Agreement by "unilaterally disavow[ing]" it in February 2020, as well as by selling the production slot two shredder to another customer and by missing delivery dates in June,

September, and December 2019.  (Id.)  Wall argues 3TEK's actions over the course of dealing constitute waiver of the Sales Contract requirement and that any retraction of that waiver was untimely. (Id. at 18-19.)  Therefore, Wall contends, it was never required to enter into any other agreement apart from the February Agreement.  Wall finally argues that, because 3TEK did not immediately refund all of Wall's deposit and Dan Wall withdrew his demand for a refund, the February Agreement was either never cancelled or was revived.  (Id. at 7.)

With these contentions in mind, the court starts with the February Agreement.

### 3.  February Agreement

The February Agreement is governed by Article 2 of North Carolina's UCC as it concerns the sale of goods.  See N.C. Gen. Stat. § 25-2-102.  "The Uniform Commercial Code applies more liberal rules governing the formation of contracts than the rules applied under traditional common law."  Neugent v. Beroth Oil Co., 560 S.E.2d 829, 834 (N.C. App. 2002) (quoting Fordham v. Eason, 521 S.E.2d 701, 705 (N.C. 1999)).  Under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  N.C. Gen. Stat. § 25-2-204(1); id. § 25-2-207(3) ("Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for

27

sale although the writings of the parties do not otherwise establish a contract.").  "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."  Id. § 25-2-204(3).

Under North Carolina law, interpretation of a written and unambiguous contract is a question of law for the court.  Briggs v. Am. & Efird Mills, Inc., 111 S.E.2d 841, 843 (N.C. 1960). "Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution."  Lane v. Scarborough, 200 S.E.2d 622, 624 (N.C. 1973).  When construing contractual terms, a contract's plain language controls.  See DeLoach v. Lorillard Tobacco Co., 391 F.3d 551, 558 (4th Cir. 2004) (noting that "as under general principles of contract law, our task is to 'give ordinary words their ordinary meanings.'" (quoting Internet East, Inc. v. Duro Commc'ns., Inc., 553 S.E.2d 84, 87 (N.C. Ct. App. 2001)); Walton v. City of Raleigh, 467 S.E.2d 410, 411 (N.C. 1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.").  "If the contract is ambiguous, however, interpretation is a question of fact . . . and resort to extrinsic evidence is necessary . . . ."  Crider v. Jones Island Club, Inc., 554 S.E.2d 863, 866 (N.C.

Ct. App. 2001) (internal citations omitted).  An ambiguity may exist if the language is "fairly and reasonably susceptible to either of the constructions asserted by the parties." Glover v. First Union Nat'l Bank of N.C., 428 S.E.2d 206, 209 (N.C. Ct. App. 1993); see also Crawford v. Potter, No. 1:04CV303, 2005 WL 2452092, at *4 (M.D.N.C. Oct. 4, 2005) ("Ambiguity is not created merely by a difference of opinion between the parties on the issue of what certain terms mean.") (citing Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522 (N.C. 1970)).  In determining whether language is ambiguous, "words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible." Anderson v. Anderson, 550 S.E.2d 266, 269-70 (N.C. Ct. App. 2001) (citation omitted).

The parties dispute whether the February Agreement constitutes a valid contract for sale or a price quotation.  In general, price quotations are not offers.  See Audio Visual Assocs., Inc. v. Sharp Elecs. Corp., 210 F.3d 254, 259 (4th Cir. 2000) (applying the UCC as adopted in Maryland and concluding "[w]ithout more, [price quotations] amount to an invitation to enter into negotiations, but generally they are not offers that can be accepted to form binding contracts"); Kraft Foods N.A., Inc. v. Banner Eng'g Sales, Inc., 446 F. Supp. 2d 551, 568 (E.D. Va. 2006); J.D. Fields & Co., Inc. v. U.S. Steel Int'l, Inc., 426

29

F. App'x 271, 276 (5th Cir. 2011).[13]  However, if a price quotation is sufficiently detailed, it can constitute an offer capable of acceptance.  See U.S. Steel, 426 F. App'x at 276; 77A C.J.S. Sales § 43 (2019) ("[P]rice quotations may be 'offers,' if they are sufficiently definite, in that they include a description of the goods and the quantity, price, delivery terms, and the time the price would be held, and only the buyer's assent is necessary to form a binding contract.").

In order for a price quotation to be sufficiently detailed, "it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract." U.S. Steel, 426 F. App'x at 277 (citation omitted).  If the price quote contains language that "would condition the formation of a contract on some further step," id. at 279, or "is expressly qualified by statements that . . . look[] toward some future contract," 77A C.J.S. Sales § 43 (2019), then it is unlikely to constitute an offer.

Here, the February Agreement is significantly detailed.  The

_____

[13] While U.S. Steel is an unpublished out-of-circuit case, the court relies on it for the persuasiveness of its reasoning, as it is consistent with North Carolina law on price quotations and North Carolina and Texas law on contracts appears similar, if not identical, in pertinent respects.  The case is also cited by Wall.  (Doc. 12 at 19.)  To be sure, where there is no state law on point, it is the court's obligation, sitting in diversity, to apply the law it predicts the forum state's highest court would adopt, if presented with the issue.  Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002).

Case 1:20-cv-00371-TDS-JLW   Document 86   Filed 03/01/22   Page 30 of 47

11-page document is the result of nearly a year of discussions between Wall and 3TEK and includes: 1) price; 2) quantity; 3) detailed product specifications; 4) shipping and assembly information; 5) payment terms; 6) warranty information; and 7) a validity period through 2019. Under the UCC, this level of detail and specificity sufficiently transforms this quotation into a valid offer. See U.S. Steel, 426 F. App'x at 278 n.6 (collecting cases where similarly detailed price quotations were valid offers and noting the "UCC tolerates a great deal of incompleteness and even contradiction in offer and acceptance").

Under the February Agreement, Wall's payment of a $100,000 deposit entitled it to a right of first refusal for a specific NEXT shredder (production slot 2 or 6). However, the February Agreement conditioned receipt of a guaranteed production slot of a NEXT shredder (after Wall exercised its right of first refusal) on the occurrence of two events: the execution of a separate "Sales Contract," and Wall's payment of the remaining 20% of its deposit. Upon receipt of both a signed Sales Contract and payment of the 20% deposit, Wall would receive a guaranteed production slot and 3TEK would pledge a "finalized ready to ship date." (Doc. 41-1 at 8). In the event Wall did not pay the remainder of its deposit and timely sign the separate Sales Contract, its right of first refusal would expire. (Doc. 41-1 at 8.) Thus, assent to the quote in the February Agreement is not all that was needed to ripen the

offer into a contract for the sale of a shredder because of these additional requirements. See U.S. Steel, 426 F. App'x at 277. Rather, the February Agreement was "expressly qualified by statements that . . . look[] toward some future contract." See 77A C.J.S. Sales § 43 (2019); (Doc. 41-1 at 8 ("1.) Signing of the 3TEK Sales Contract will be required")).

Wall argues that 3TEK waived the requirement for an executed Sales Contract for the sale of the shredder, rendering the February Agreement a sales contract. But this claim is based on an unreasonable reading of the February Agreement. And even in the light most favorable to Wall, the evidence fails to support a claim that 3TEK, by its conduct, waived the Sales Contract requirement for the sale of the NEXT shredder.

As a legal matter, all terms of the February Agreement must be given their ordinary meaning, and the agreement must be read as a whole in order to discern the intention of the parties. DeLoach, 391 F.3d at 558 (applying North Carolina law). The document clearly contemplates the execution of a Sales Contract. The requirement is noted in the section addressing the buyer's obligation for obtaining a right of first refusal for a specific production slot, reflecting the seller's intent not to commit a production slot without a signed Sales Contract. Wall would have the court conclude that any waiver of this requirement for a production slot extends the waiver to the requirement of a Sales

32

Contract to complete a sale.  But there is simply no indication in the February Agreement that 3TEK ever intended to sell a multimillion-dollar machine without a Sales Contract.  To the contrary, the February Agreement expressly provides that if Wall elects to "take the second slot," "the signing of a Sales Contract will be required."  (Doc. 41-1 at 8.)  Even if this were ambiguous, which it is not, it is not susceptible to the interpretation Wall offers – that the Sales Agreement is merely a predicate for a production slot, which was waived by 3TEK's provision of one, and not a requirement for the ultimate sale of the machine.[14]  Anderson, 550 S.E.2d at 269-70 ("words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible") (internal quotations and citations omitted); Lee v. Cooper, 801 S.E.2d 371, 373 (N.C. Ct. App. 2017) (noting an option contract is "a continuing offer to sell," not itself an agreement to sell).

As for Wall's argument that 3TEK waived the requirement of a Sales Contract through its conduct,[15] Wall cites 3TEK's conduct

---

[14] This is demonstrated, for example, by the fact that had Wall only put down $100,000 to hold a right of first refusal but never exercised it for a specific production slot, instead waiting for 3TEK to advise that a machine was completed, it could not contend there is no requirement to execute a Sales Contract.

[15] At one point in his deposition, Wall confessed that he had thought the Sales Agreement had been executed.  (Doc. 41-2 at 171:15-172:1 ("I didn't realize we didn't have – we didn't even sign the actual contract.").)  If he had thought so, there is no record evidence to support that belief,

33

from May 30, 2019, to February 2020 without insisting on a signed Sales Contract until February 24, 2020. (Doc. 50 at 15-18.)

Waiver is "an intentional relinquishment or abandonment of a known right or privilege." Ernst v. N. Am. Co. for Life & Health Ins., 245 F. Supp. 3d 680, 687 (M.D.N.C. 2017) (quoting Bombardier Cap., Inc. v. Lake Hickory Watercraft, Inc., 632 S.E.2d 192, 196 (N.C. Ct. App. 2006)). Waiver may be express or "may arise from the acts and conduct of the party which would naturally and properly give rise to an inference that the party intended to waive the agreement." Guerry v. Am. Tr. Co., 68 S.E.2d 272, 275 (N.C. 1951). However, waiver requires conduct that the right was intentionally surrendered, and any waiver is not permanent but can be withdrawn. Klein v. Avemco Ins. Co., 220 S.E.2d 595, 599 (N.C. 1975) ("The intention to waive may be expressed or implied from acts or conduct that naturally lead the other party to believe that the right has been intentionally given up." (emphasis added)); N.C. Gen. Stat. § 25-2-209(5); cf. Briston Metals, LLC v. Messer, LLC, 498 F. Supp. 3d 840, 855 (E.D. Va. 2020) (under Pennsylvania's UCC identical to North Carolina's, waiver can be implied "through unequivocal conduct demonstrating an intent to relinquish a known right"). "Waiver is a mixed question of law and fact. When the

and it is contradicted by Wall's own attorney's February 24, 2020 email, which confirmed that Wall understood that it was operating only under a sales quote and that there was no Sales Contract. (Doc. 53-15 at 3.)

34

facts are determined, it becomes a question of law." <u>Hicks v.</u>
<u>Home Sec. Life Ins. Co.</u>, 39 S.E.2d 914, 918 (N.C. 1946).

Wall does not claim, nor is there evidence, that anyone at
3TEK ever advised that a Sales Contract would not be required,
thus there is no evidence of an express waiver. (Doc. 41-2 at
203:7-15 (Dan Wall conceding 3TEK never told Wall a Sales Contract
would not be required).) Wall relies principally on 3TEK's failure
to send a copy of the Sales Contract to Wall after Wall's CFO,
Smith, proposed modifications in a redlined version on April 19,
2019. (Doc. 51-1 at 6 ¶ 21.) But Wall overlooks the fact that
Padula had contacted Smith at least <u>twice</u> thereafter and that <u>Smith</u>
responded that he was busy and promised to provide a response to
3TEK's concerns about the proposed revisions. But then Dan Wall
terminated Smith's employment, and no one at Wall ever followed
through by responding to 3TEK. In other words, not only was Wall
aware that 3TEK required a signed Sales Contract, the Sales
Contract was last in <u>Wall</u>'s hands and it is <u>Wall</u> who failed to
respond to 3TEK about Wall's requested revisions. Wall responds
by faulting 3TEK for not following up with it after that point in
time, noting that 3TEK was also aware that Smith had left Wall's
employ. But Smith was not terminated until November 2019, and
such failure to act, especially when any sale was at least months
away, is not sufficient evidence upon which a jury could reasonably
find waiver. Moreover, to permit this silence to constitute waiver

35

of a Sales Contract, especially when Padula noted there was "no huge rush" (Doc. 52-1 at 2), would reward Wall for its failure (or refusal) to comply with the terms of the deal.

Moreover, Padula's May 30, 2019 email response to Smith stating, "[w]e are happy to comply with a delivery penalty clause," was <u>conditional</u>, noting "as long as you take equal responsibility for your responsibilities to insure timely installation".[16]  (Id.) Padula also stated that further discussions over the proposed revisions were necessary ("I am following up on this loose end wanting to get this document signed as we move closer" and "see if we can dust this off and bring acceptable closure").  (Id.) Smith's response acknowledged the conditional nature of 3TEK's response and lack of agreement, stating in an email, "Yes, I think <u>we were very close to agreement</u> – I've been buried in other projects so I apologize for the delay.  Let me chat with Dan about this and I'll get a response to you."  (Doc. 40 at 8 (emphasis added).)  But Dan Wall did not know whether Smith ever responded to Padula.  (Doc. 41-2 at 144:16-22 (Q: So what became of that? A: I have no clue.").)  Though Wall relies on its own failure to respond to 3TEK about Wall's proposed revisions to the Sales Contract to support its claim of waiver, at no time did 3TEK do anything that could reasonably be construed to have waived the

---

[16] It is also notable that Padula referred only to "a" delivery penalty clause and not to any more specific penalty.

requirement of a separate Sales Contract to complete the <u>sale</u>.

Wall further relies on what he describes as his discussions with 3TEK between May 30 and September 30, 2019. However, these related to questions and reports on the status of the manufacture of the shredder. (<u>Id.</u> at 167-169.) For example, in July of 2019, Padula sent Wall photos of the processing scrap from a 6280 shredder and stated that 3TEK "looked to formalize those [production results] in terms of tons/hrs over two more weeks of testing." (<u>Id.</u> at 168-169.) On July 25, 3TEK invited Dan Wall to Texas to see a shredder and talk with Morrison, but the trip was cancelled. (<u>Id.</u> at 167.) Otherwise, apart from general statements about the status of the manufacturing process, Wall offers little by way of specifics about the conversations taking place between May and September. (<u>See</u> <u>id.</u> at 145.) At no time did anyone at 3TEK even suggest that it would sell the machine without a Sales Contract.[17]

---

[17] Even if Wall's inference that 3TEK waived the Sales Contract requirement by moving forward without it were reasonable, at best Wall could contend that 3TEK waived the requirement of an executed Sales Contract in order for Wall to receive a guarantee for production slot 2 if 3TEK had "pledged" a "finalized ready to ship date" (upon payment of the 20% deposit) under the February Agreement. But even that is unsupported by the record, because of all the alleged promises for delivery cited by Wall, which the court accepts at this stage, none was a "pledged" "finalized ready to ship <u>date</u>" required by the February Agreement until February 24, 2020. (<u>See</u> Doc. 41-1 at 18 ("If you choose this path then 3TEK will pledge a firm shipment date in September of 2019."); <u>id.</u> at 38 (seeking written verification by Wall in a shredder "that is being manufactured by the end of the year"); Doc. 41-1 at 38 (Maly acknowledging he told Wall, "I had said previously MANUFACTURED

37

The lack of basis for Wall's claim of waiver is underscored by its contention of an agreement of a 10% penalty for delivery delay.  Wall contends that 3TEK agreed to a 10% delivery delay penalty, which Wall proposed as a revised term of the Sales Contract, while simultaneously contending that 3TEK waived any requirement that the very same Sales Contract be executed.  In other words, Wall seeks both to enforce the proposed delivery terms from the redlined-Sales Contract (including the proposed September 30 deadline) while simultaneously arguing that the Sales Contract requirement from the February Agreement was waived.  In the end, Dan Wall appears to rely on his belief that he had a sales agreement with 3TEK because, as he testified, "I mean, we shook hands.  We shook hands.  We exchanged funds and we signed sales quotes and talked about the progress of my machine."  (Id. at 160:5-10.)

Because Wall's contention that 3TEK waived the Sales Contract

---

by the end of December, deliver will be mid to late January."); Doc. 52-5 at 3 (Maly texting Wall seeking a signed commitment that 3TEK pay a penalty "if we don't deliver in January"); Doc. 52-6 (2/6/2020 contract, sent 2/24/2019, stating "ready to ship from the factory in Grand Prairie no later than **February 28, 2020**"); Doc. 52-8 (Morrison 2/24/2020 email noting the machine is "complete and available for shipment from the manufacturing locations").)  Even the draft Sales Contract exchanged between the parties in spring 2019 noted that delivery would be "by approximately September 30, 2019" and that "[s]uch delivery schedule is subject to revision upon completion of final specifications by [3TEK] and subject to reasonable or excusable delays."  (Doc. 51-8 at 6.)  Further, Dan Wall concedes there is nothing in the February Agreement that provides a date.  (Doc. 41-2 at 164:21-165:3.)  Rather, he acknowledges that the dates given were "roundabout dates" that were "times of year that were given."  (Id. at 233:18-24.)  It is also notable that shipment, and thus the timing of delivery, was the responsibility of the buyer under the February Agreement; for these reasons, 3TEK could only promise a date the machine would be ready for shipment.

38

requirement to purchase a NEXT shredder is not supported by the law or the facts, Wall's claim for breach of contract fails. However, even if Wall were correct in assuming that the February Agreement constituted a valid sales contract, the question becomes what became of it when Wall demanded return of its full deposit in October 2019.

### 4. Mutual Rescission of the February Agreement

3TEK contends that Wall rescinded the February Agreement and that 3TEK accepted it, thus terminating any responsibility under that document.

Rescission of a contract may be made by mutual agreement. Top Line Const. Co. v. J.W. Cook & Sons, Inc., 455 S.E.2d 463, 466 (N.C. Ct. App. 1995). The "mutuality essential to rescission may be found to exist if, after breach of contract or abandonment by one party, the other by word or act declares the contract rescinded." Brannock v. Fletcher, 155 S.E.2d 532, 542 (N.C. 1967) (internal quotations and citations omitted). To constitute rescission by mutual consent, there must be an abandonment or repudiation of the contract by one of the parties that is assented to or acquiesced in by the other. Id. at 542 (quoting 91 C.J.S. Vendor & Purchaser § 124 (1955)). A rescission "implies the entire abrogation and undoing of the contract from the beginning." Lumsden v. Lawing, 421 S.E.2d 594, 599 (N.C. Ct. App. 1992). In the case of rescission, "ordinarily a party may not seek damages

39

arising out of the breach of contract such as benefit of the bargain and special damages." Id. (citing Kee v. Dillingham, 49 S.E.2d 510, 512 (N.C. 1948)).

On October 9, 2019, Dan Wall emailed Padula with the subject line "6280 deposit." (Doc. 52-3 at 4.) Wall wrote that "since 3TEK wasn't able to meet the June date or September date and it sounds like you probably won't make the end of the year date, I am requesting my deposit back in full." (Id.) Although he thought the NEXT shredder was "a great machine," Wall informed 3TEK he "cannot afford to wait any longer" and that he would "keep you and 3tek [sic] in mind for the future." (Id.) Wall ended his email by stating "[p]lease get me in touch with the appropriate person and I will provide my wiring instructions." (Id.) When asked at his deposition, "on October 9th, 2019, you're saying 'I'm done. We're done'; right?" Dan Wall replied "Yes, sir." (Doc. 41-2 at 154:12-15.) Dan Wall further confirmed his intent that the October 9 email serve as cancellation of the February Agreement:

> Q: Is it your testimony that there would be no contract between the parties after October 2019, if 3TEK had given Wall all of its money back?
>
> A: On that day, I was very mad about the missed dates and being misled, and if I would have gotten my money back, yes, we would have both gone our separate ways.

(Id. at 160:20-161:1.)

One week later, on October 16, Dan Wall confirmed his intent to cancel by requesting contact information for sending wiring

40

instructions for return of his full deposit.  (Doc. 52-3 at 2.)
3TEK immediately acknowledged Wall's cancellation, "regretfully
accept[ing]" Wall's "request to cancel the Sales Order."  (Id. at
5.)  3TEK's Morrison confirmed that "3TEK will reimburse the
deposits made toward this purchase totaling $459,900.00."  (Id.)
At the time, both parties reflected their intent to rescind the
February Agreement and confirmed that intent in writing when Wall
submitted his refund request and 3TEK accepted it.  (Doc. 41-2 at
155:9-11 (demonstrating Wall understood that 3TEK considered the
February Agreement terminated).)  By demanding his refund in full
(and not just the amount in excess of the $100,000 initial
deposit), Wall sought to situate the parties in their positions
before they entered into the February Agreement.  Johnson v. Smith,
Scott & Associates, Inc., 335 S.E.2d 205, 207 (N.C. Ct. App. 1985)
(noting that rescission "abrogates the contract from its beginning
and restores the parties to the position they would have been in
had the contract not been made").

     Wall now contends that the February Agreement had "never been
fully cancelled" because "[y]ou guys never sent the money back."
(Doc. 41-2 at 157:23-25.)  Wall also argues that Dan Wall rescinded
his request for return of the deposit, thus effectively reinstating
the February Agreement.  But, as 3TEK argues, these contentions
fail both legally and on the factual record.

     Where a contract is silent on timing, an action is taken

41

"seasonably" under a contract controlled by the UCC as adopted by
North Carolina if it is done "within a reasonable time." N.C.
Gen. Stat. § 25-1-205(b). What constitutes "reasonable time"
depends on the "nature, purpose, and circumstances of the action."
Id. at § 25-1-205(a). While reasonableness is generally a question
of fact, "the issue can become a question of law only when the
facts are undisputed and only when an inference can be drawn as to
reasonableness of notice." GATX Logistics, Inc. v. Lowe's Cos.,
Inc., 548 S.E.2d 193, 196 (N.C. Ct. App. 2001) (internal quotations
and citations omitted).

    Here, the facts are undisputed. Wall sent a full cancellation
request on October 9 (Doc. 52-3 at 4), and 3TEK accepted that
cancellation request on October 16 (id. at 5). 3TEK committed to
returning Wall's full deposit, was immediately prepared to send
Wall $100,000, and asked for wiring instructions in order to do
so. (Id.) But as Wall concedes, it never responded to provide
any wiring information. (Id.; Doc. 41-2 at 156:18-20.) Rescission
of the February Agreement was therefore effective when 3TEK
accepted Wall's request to cancel the contract on October 16,
reflecting the mutuality essential to rescission. As reflected by
3TEK's acceptance of Wall's cancellation one week later, the
contract had been mutually rescinded by the parties. See Brannock,
155 S.E.2d at 542 (holding that rescission of a contract "may be
by mutual agreement" and "a rescission of the contract entitles

each party to be placed in Statu quo ante fuit").

Wall contends that 3TEK's acceptance of Wall's request to terminate the February Agreement was ineffective because 3TEK did not refund Wall's deposit. Such a belief is legally and factually unfounded. There is no evidence that 3TEK ever refused to return Wall's deposit. Rather, 3TEK expressly agreed to do so and stated it would have to do it over time because Wall's deposit was invested in the machine Wall ordered but had now reneged on. (Doc. 52-3 at 5.) Because Wall never sent 3TEK wiring instructions for the return of the funds, as 3TEK requested, and because Wall maintains that sometime between October 16 and November 13 Dan Wall "withdrew his demand for a refund" upon renewing his interest in a NEXT shredder, Wall cannot claim that 3TEK refused to return its deposit, much less that it did not do so seasonably so as to negate the rescission of the February Agreement.[18]

---

[18] Had Wall been dissatisfied with this payment schedule or desired its deposit sooner, it could have considered suing 3TEK for failure to timely return it. Under that assumption, Wall could have maintained that 3TEK was liable for any damages allegedly incurred before the cancellation as a result of any alleged breach of the contract. Brannock, 155 S.E.2d at 541. Here, Wall makes two allegations of breach prior to rescinding the February Agreement in October. The first is that 3TEK missed a delivery date in June of 2019. (Doc. 41-2 at 152:18-20.) This contention is based on a prior, 2018 quotation 3TEK provided to Wall that estimated that the NEXT shredder would be ready to ship by June 2019. However, that agreement was superseded by the February Agreement which, as Wall recognizes, contains no promise to deliver a NEXT shredder in June. (Id. at 153:1-6.) Wall's second allegation of breach is that 3TEK missed a delivery date in September 2019 promised by Padula. (Doc. 50 at 7, 20.) However, as noted, there is no evidence in the record that 3TEK ever gave Wall a "finalized ready to ship date" as required by the February Agreement. (Doc. 41-1 at 8.)

43

Finally, while Dan Wall changed his mind after 3TEK accepted his cancellation and expressed interest in buying a shredder, withdrawing his request for a refund, and while Maly said he would work "to ensure that the deal was completed," Wall refused to respond to Maly's email to confirm in writing that Wall was "intent on moving forward with the purchase of a 6280 that is being manufactured by the end of the year." (Doc. 52-4 at 2.) Dan Wall's assumption that after October 16 the parties were operating under the mutually-cancelled February Agreement was just that, an assumption. (Doc. 41-2 at 171:15-172:7 ("we'd already had an agreement in place. . . . Look at the signed quote. . . . I didn't even realize we didn't have – we didn't even sign the actual contract. . . . we had an agreement that the money was sent. The machine was being built. I was getting updates. . ."); (id. at 157:20-25 ("I guess this had never been <u>fully canceled</u>. You guys – had never been canceled. You guys never sent the money back." (emphasis added)).) Wall cites no authority for the proposition that mutual cancellations are ineffective unless deposits are refunded immediately. There is no evidence of any writing, statement, or conduct to mutually put the February Agreement back in place. Nor was there any indication that Wall would be returned to his abandoned place for production unit 2. Even Dan Wall understood that Maly's text requests in December were to sign a new contract. (<u>Id.</u> at 172:18-173:2.) In light of this record,

44

Wall has not provided sufficient evidence that a jury could reasonably find that 3TEK somehow revived the February Agreement through its efforts to sell Wall a shredder after Wall rescinded the February Agreement but then later withdrew his request to have his prior deposit refunded.

Even if the parties could be said to have mutually revived the February Agreement, however, for the reasons already stated, it was not without the requirement that a Sales Agreement eventually be executed.

### 5. Period After Mutual Rescission

Wall's complaint alleges breach of the February Agreement – with the modifications it claims for 10% delivery delay penalty, $30,000 in set up costs, and free hammers. It does not allege that any other agreement, oral or written, was ever entered into by the parties.[19]

Given the court's determination that 3TEK accepted Wall's rescission of the February Agreement, there was no binding agreement thereafter. By the time the parties got close to closing the sale in February 2020, Nancy Wall, Wall's attorney, acknowledged the absence of a sales contract and sought concessions that she represented were "agreed upon and/or offered by 3TEK."

---

[19] Even had Wall entered into a new oral agreement with 3TEK after the parties mutually rescinded the February Agreement, that agreement would appear to be barred by the statute of frauds, raised by 3TEK in its amended answer, as it was for the sale of goods for more than $500. N.C. Gen. Stat. § 25-2-201. (See Doc. 85 ¶ 58.)

(Doc. 53-15 at 4.)  The largest of them, a 10 percent reduction in price for not delivering the machine by December 31, 2019, would have totaled approximately $229,950.  However, as noted previously and evidenced by Smith's failure to respond to Padula in April and May 2019, 3TEK never assented to this proposed revision of the Sales Contract.  (Doc. 52-1 at 2.)

After review of Wall's requests, Morrison properly regarded Nancy Wall's letter as terms of an offer to purchase a NEXT shredder.  (Doc. 41-1 at 43.)  By then, Wall had made threats of legal action against 3TEK, and 3TEK determined that the relationship had soured.  (Doc. 53-15 at 2; Doc. 53-14 at 2.)  3TEK was within its rights to reject the offer, and Morrison enclosed a check to Wall in the amount of $479,687.72, which represented Wall's full deposit with interest.  (Doc. 41-1 at 45.)

Even if the February Agreement were deemed to still be in place in some form, it did not contain the 10% delay penalty, for the reasons noted, and there was as of yet no signed Sales Contract.  Wall's complaint alleges that "Wall has been, and remains, ready and able to perform the Contract."  (Doc. 2 at ¶ 49.)  However, according to Wall, the "Contract" includes the ten percent reduction in the cost of the NEXT shredder (roughly $229,950).  While there was no meeting of the minds as to the terms of a delay penalty, 3TEK eventually rejected this request in February.  Wall does not allege that it was ready, willing, and

46

able to purchase the machine without the nearly quarter of a million dollar discount it erroneously contends was part of the February Agreement, and by signing the Sales Agreement.

3TEK's motion for summary judgment will therefore be granted.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that 3TEK's motion to strike Dan Wall's declaration (Doc. 56.) is DENIED but that the court will consider the testimony to the extent noted herein, its motion for summary judgment pursuant to Rule 56 (Doc. 40) is GRANTED, and this action is DISMISSED WITH PREJUDICE.

A judgment in accordance with this Order shall issue contemporaneously.

                                    /s/   Thomas D. Schroeder
                                    United States District Judge

March 1, 2022